## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BLUEFIELD DIVISION

| | | |
|---|---|---|
| **JAMES DWIGHT SIMS** | ) | |
| **on behalf of J.D.S.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 1:14-25064** |
| | ) | |
| **CAROLYN W. COLVIN ,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for child's insurance benefits based on disability and Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. By Standing Orders entered September 15, 2014, and January 5, 2016 (Document Nos. 3 and 17.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Motion for Remand (Document No. 12.) and Defendant's Motion for Judgment on the Pleadings. (Document No. 15.)

The Plaintiff, James Dwight Sims, on behalf of his minor son, J.D.S. (hereinafter referred to as "Claimant"), filed an application for SSI on November 30, 2010 (protective filing date), alleging disability as of August 20, 2008, due to attention deficit hyperactivity disorder ("ADHD"). (Tr. at 13, 118-19, 124-29, 149.) The claim was denied initially and upon reconsideration. (Tr. at 13, 49-50, 51-54, 62-64.) On September 12, 2011, Claimant requested a hearing before an

1

Administrative Law Judge (ALJ). (Tr. at 65-67.) A hearing was held on May 1, 2013, before the Honorable Todd Spangler. (Tr. at 13, 33-48.) By decision dated May 13, 2013, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 13-28.) The ALJ's decision became the final decision of the Commissioner on June 25, 2014, when the Appeals Council denied Claimant's request for review. (Tr. at 1-6.) Claimant filed the present action seeking judicial review of the administrative decision on August 25, 2014, pursuant to 42 U.S.C. § 405(g). (Document No. 1.)

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Standard

A child is disabled under the Social Security Act if he or she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(I). Under the Regulations in force during all times relevant to Claimant's claim, a three-step sequential evaluation is undertaken to determine disability for children. 20 C.F.R. § 416.924(a) and (b). First, the ALJ must determine whether the child is engaged in substantial gainful activity. Id. If the child is, he or she is found not disabled. Id. § 416.924(a). If the child is not, the second inquiry is whether the child has a severe impairment. Id. § 416.924(a) and (c). An impairment is not severe if it constitutes a "slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations." Id. If a severe impairment is present, the third and final inquiry is

2

whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 416.924(d). To meet or medically equal a listing, a child's impairment(s) must equal the severity of a set of criteria for an individual listing impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1. Id., § 416. 924(d). If the child's impairment meets or medically or functionally equals the requirements of Appendix 1, the claimant is found disabled and is awarded benefits. 20 C.F.R. § 416.924(d)(1). If it does not, the claimant is found not disabled. Id. § 416.924(d)(2). A mere diagnosis of an impairment, however, does not mean that it meets a listed impairment. See id. § 925(d). Rather, a child's impairment meets a listed impairment only if it meets all of the requirements of the listed impairment. See Sullivan v. Zebley, 493 U.S. 521, 530, 110 S.Ct. 885, 891, 107 L.Ed.2d 967 (1990).

Listing 112.11 states that attention deficit hyperactivity disorder is

[m]anifested by developmentally inappropriate degrees of inattention, impulsiveness and hyperactivity.
The required level of severity for these disorders is met when the requirements in both A and B are satisfied.
A. Medically documented findings of all three of the following:
1. Marked inattention; and
2. Marked impulsiveness; and
3. Marked hyperactivity.
AND
B. * * * for children (age 3 to attainment of age 18), resulting in at least two of the appropriate age-group criteria in paragraph B2 of 112.02.

If a child has a severe impairment or combination of impairments that does not meet or medically equal any listing, the ALJ must decide in view of six domains of functioning whether the child has limitations which "functionally equal the listings" of disabling conditions. See 20 C.F.R. § 416.926a(a).

The Regulations provide that if a child's severe impairments do not meet or medically equal the listings, the Commissioner will assess all functional limitations caused by the child's impairments.   20 C.F.R. § 416.926a(a). Functional equivalence can be shown when a child has two "marked" limitations or one "extreme" limitation in six domains of functioning. 20 C.F.R. § 416.926a(a), (b)(1). The six areas of functioning include: (i) acquiring and using information; (ii) attending and completing tasks; (iii) interacting and relating to others; (iv) moving about and manipulating objects; (v) caring for yourself; and (vi) health and physical well-being.   See 20 C.F.R. 416.926a(b)(1)(I) - (vi); 65 Fed. Reg. 54,747 (2000).[1] These domains are "broad areas of functioning intended to capture all of what a child can or cannot do." Id. § 416.926a(b)(1). The Regulations state as follows respecting how the Social Security Administration considers a child's functioning:

> We will look at the information we have in your case record about how your functioning is affected during all of your activities when we decide whether your impairment or combination of impairments functionally equals the listings. Your activities are everything you do at home, at school, and in your community. We will look at how appropriately, effectively, and independently you perform your activities compared to the performance of other children your age who do not have impairments.

See 20 C.F.R. § 416.926a(b). When evaluating a child's ability to function in each domain, several factors are taken into consideration to help determine whether the child's impairments affect his or her functioning and whether his or her activities are typical of other children his or her age who do not have impairments. Id. § 416.926a(g) - (l).

---

[1]   Prior to the 2001 changes, the broad areas of development or functioning in which a claimant's limitations were assessed included:   (1) cognition/communication; (2) motor; (3) social; (4) personal; and (5) concentration, persistence or pace. 20 C.F.R. § 416.926a(c)(4)(i)-(iii) and (v)-(vi) (2000).

If a child has "marked" limitations in two domains of functioning, or an "extreme" limitation in one domain, the Commissioner will find that the impairment functionally equals the listings, and the child will be found disabled. Id. § 416.926a(a). The Regulations define a "marked" limitation as when an impairment interferes seriously with the child's functioning, and is more than moderate, but less than extreme. 20 C.F.R. § 416.926a(e)(2)(i) (2013). A "marked" limitation also means when standardized tests are used as the measure of functional abilities, a valid score that is at least two, but less than three, standard deviations below the norm for the test. Id. The Regulations define an "extreme" limitation in a domain as when an impairment "very seriously" limits day-to-day functioning, or interferes "very seriously" with one's ability to independently initiate, sustain, or complete activities.  Id. § 416.926a(e)(3)(i). "Extreme" limitation also means "a limitation that is 'more than marked.'" Id. This rating is given to the worst limitations. See id.

20 C.F.R. § 416.924a provides that in determining disability for children, all relevant information in the case record will be considered, including medical evidence, such as testing and opinions from medical sources "about the nature and severity of your impairment," and information from other people, including parents, other caregivers, and teachers. 20 C.F.R. § 416.924a. The Regulations further specifically provide that ALJs may ask for and consider opinions from medical experts regarding the nature and severity of a child's impairment and on whether the impairment(s) equals the requirements of any impairment listed in Appendix 1. See 20 C.F.R. § 416.927(f)(2)(iii). In considering these opinions, ALJs evaluate them using the factors as used for evaluating all opinion evidence, including the supportability and consistency of the evidence, and specialization of the source. Id.

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since the protective filing date, November 30, 2010. (Tr. at 16, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from the severe impairments of attention deficit hyperactivity disorder and a behavioral disorder. (Tr. at 16, Finding No. 3.) At the third and final inquiry, the ALJ concluded that Claimant's impairments did not meet or medically equal the level of severity of any listing in Appendix 1. (Tr. at 16, Finding No. 4.) The ALJ then found that Claimant did not have an impairment or combination of impairments that functionally equaled the listings. (Tr. at 16, Finding No. 5.) The ALJ found that the statements of Claimant's brother and father were "only partially credible, when viewed with the medical and educational records in the file, and the opinion evidence." (Tr. at 20.) For these reasons, the ALJ found Claimant was neither under a disability, nor entitled to benefits. (Tr. at 28, Finding No. 6.)

<u>Scope of Review</u>

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In <u>Blalock v. Richardson</u>, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize

6

the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is not supported by substantial evidence.

Claimant's Background

Claimant was born on May 3, 2004, and was 8 years old at the time of the ALJ's decision, May 13, 2013. (Tr. at 16, Finding No. 1; 35, 124.) Claimant was enrolled in the third grade at the time of the administrative hearing. (Tr. at 16, 37.)

The Medical Record

The Court has reviewed all the evidence of record, including the medical evidence of record, and will discuss it below as it relates to the undersigned's findings and recommendation.

On July 18, 2008, Zetta Nicely, Supervised Psychologist and Marcie Vaughan, M.A., Licensed Psychologist, from Seneca Health Services, conducted a psychological evaluation of Claimant, who was four years old, to evaluate attention and behavioral problems. (Tr. at 390-92.) Claimant's father reported that Claimant had been removed from his mother's care on several occasions, but had not been removed from his home, where he resides with a family friend. (Tr. at 390.) Last school year, Claimant attended preschool once a week and was expected to attend three days a week in the fall. (Id.) He was in trouble a few times last school year for disruptive behavior, which included having hit a classmate in the head with a rock. (Id.) Claimant's father reported that Claimant was unable to focus and would not listen. (Tr. at 390-91.) Claimant attempted to run away from them in the house if he was not redirected and would kick and scream if not allowed to watch cartoons. (Tr. at 391.) During the exam, it was noted that Claimant whined a lot and disregarded the direction of his father and his friend. (Id.)

7

The results of the Kaufman Brief Intelligence Test ("K-BIT-2") were invalid because Claimant's scores varied and were inconsistent. (Tr. at 391.) Claimant required verbal redirection to the task at hand and responded impulsively, at times. (Id.) The Burks Behavior Rating Scales, Second Edition ("BBRS-2"), which addressed seven aspects of behavior that were relevant to adjustment in the school and community, as completed by Claimant's father, indicated high scores for impulse and control problems and disruptive behavior. (Id.) All of Claimant's scores were in the clinical range, except for physical deficits. (Id.)

Claimant was diagnosed with Parent-Child Relational Problem and Attention-Deficit Disorder, and was assessed a GAF of 55.[2] (Tr. at 391.) Parent training was recommended, as well as therapy for Claimant. (Tr. at 392.) On July 31, 2008, Dr. Noel Jewell, M.D., conducted a psychiatric evaluation and diagnosed with possible attention deficit disorder ("ADD") and assessed a GAF of 60. (Tr. at 388-89.) Dr. Jewell opined that Claimant's behavior was "normal four-year-old behavior," and that Claimant was a product of having had multiple different authoritarian figures. (Tr. at 389.) Dr. Jewell referred Claimant to Karen Earehart for evaluation. (Id.) On August 29, 2008, Dr. Jewell noted that Ms. Earehart's evaluation revealed parent-child relational problems and some attention-deficit qualities. (Tr. at 386.) Dr. Jewell decided not to start any medications but to continue with therapy with Ms. Earehart. (Id.)

On December 15, 2009, Claimant was evaluated by David F. Samsock, M.A., a licensed psychologist, at KVC Behavioral Health Care, at the referral of the Greenbrier County School

---

[2]   The Global Assessment of Functioning ("GAF") Scale is used to rate overall psychological functioning on a scale of 0 to 100. A GAF of 51-60 indicates that the person has "[m]oderate symptoms . . . or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV") 32 (4th ed. 1994).

system, to determine whether Claimant required medically necessary in-home behavioral health services to address reported behavior and mental health issues. (Tr. at 471-501.) Claimant's father reported that Claimant would not listen, was disruptive in school, was hyperactive, wanted to be the center of attention, was physically hyperactive, was impatient and had difficulty playing quietly, and interrupted others. (Tr. at 471.) On mental status exam, Mr. Samsock observed that Claimant was cooperative, a little shy and socially anxious; demonstrated normal social reciprocity; exhibited no unusual psychomotor behavior; was somewhat physically hyperactive; was happy; and presented with judgment and insight consistent with his age. (Tr. at 472.) Mr. Samsock diagnosed disruptive behavior disorder; ADHD, predominantly hyperactive/impulsive type; and assessed a GAF of 55. (Id.) He recommended individual psychotherapy and supportive counseling addressing the symptoms of Claimant's diagnoses, as well as behavior management training and parenting coaching. (Id.) He opined that Claimant's prognosis was fair to good with treatment. (Id.)

On February 24, 2010, Mike McDaniel, M.A, a licensed psychologist, noted a history of problems focusing attention, impulsivity, and hyperactivity/restlessness, as well as significant oppositional and defiant behaviors at home and school settings. (Tr. at 384.) On mental status exam, Claimant presented with a significantly high level of psychomotor activity and his attention and concentration processes were impaired severely. (Id.) Claimant was extremely easily distracted and presented with limited insight and judgment. (Id.) Mr. McDaniel diagnosed ADHD, combined type and oppositional defiant disorder, and assessed a GAF of 50. (Id.) Claimant was five-years-old and was in Kindergarten. (Id.)

Dr. Jewell noted continued problems at school on February 26, 2010. (Tr. at 382-83.) Diagnoses remained constant and Dr. Jewell assessed a GAF of 55. (Tr. at 383.) Dr. Jewell

prescribed Adderall 2.5mg. (Id.) On March 1, 2010, Dr. Jewell noted that Claimant tolerated the Adderall well over the weekend, though the dosage was not strong enough as it slowed him down for only a short period of time. (Tr. at 380.) Dr. Jewell therefore, increased Adderall to 5mg a day for the next two weeks. (Id.) On March 8, 2010, Claimant's father reported continued problems in school as evidenced by 19 behavioral slips since starting school and that the Adderall was not helping. (Tr. at 378.) Dr. Jewell was uncomfortable trying to find medication for a five-year-old, and therefore, referred him to a child psychiatrist. (Id.)

On April 7, 2010, Claimant initiated treatment at Willow Ridge, complaining of behavioral issues that included his failure to listen to the teacher and remain in his seat, mind wandering a lot, kicking and hitting in school, some stealing, and having to be harnessed on the bus. (Tr. at 419-22.) Rhonda L. Hamm, M.S., D.O., noted a normal mental status examination, diagnosed ADD of childhood with hyperactivity, and prescribed Concerta. (Tr. at 421-22.) Dr. Hamm noted at a follow-up exam on April 23, 2010, that Claimant's father was unable to tell if the medicine had helped. (Tr. at 416.) He noted that Claimant slept and ate okay, drank two to three caffeinated sodas a day, and received plenty of candy from his grandmother. (Id.) Claimant's father admitted that he "lost it," and used the fly swatter on Claimant to discipline him. (Id.) Dr. Hamm noted that Claimant's father was struggling with parenting his difficult child while trying to remain sober, and therefore, recommended more AA availability and assistance for the father. (Tr. at 417.) Dr. Hamm increased Claimant's Concerta. (Id.) She also wrote a note to the grandmother about limiting Claimant's caffeine and sugar. (Id.)

Claimant continued to treat at Willow Grove, primarily with Dr. Hamm or Margaret C. Bruns, F.N.P., from June 15, 2010, through March 15, 2012. (Tr. at 393-415, 502-13, 522-85.) On June 15, 2010, it was reported that the medication was helping Claimant, as evidenced by

improving grades and promotion to the first grade. (Tr. at 412, 581.) Claimant's father reported that he was less of a handful now and that the father was taking parenting classes. (Id.) Claimant was continued on Concerta. (Tr. at 414, 583.) Dr. Hamm conducted a psychiatric evaluation on June 15, and again diagnosed ADHD combined type and disruptive behavior disorder, and assessed a GAF of 45. (Tr. at 394-95. 522-23.) Dr. Hamm strongly encouraged weekly therapy. (Tr. at 395, 523.)

On July 27, 2010, Ms. Bruns noted that Claimant was attending summer school, where he was bad sometimes. (Tr. at 409, 578.) Claimant's father reported that he was not listening as much as before and had poor focus. (Id.) On mental status exam, Ms. Bruns noted that Claimant was distracted and was observed jumping on the couch in the waiting room. (Tr. at 410, 579.) She increased his Concerta to 36mg. (Tr.at 411, 580.) On August 11, 2010, it was reported that Claimant had acted badly in public and had lost four pants sizes since increasing his medication. (Tr. at 406, 575.) His Concerta was decreased to 27mg and a small dose of Risperdal .5mg, was added. (Tr. at 407-08, 576-77.)

On August 25, 2010, it was reported that two days into the first grade Claimant experienced problems with attention. (Tr. at 402, 571.) Dr. Hamm noted on mental status exam that Claimant was very distracted and interrupted very frequently. (Tr. at 404, 573.) He was continued on 27mg of Concerta. (Id.) On September 23, 2010, Claimant reported that he liked school and had received an "A" in school for his behavior. (Tr. at 399, 568.) At times, however, his attention was poor. (Id.) On mental status exam, Ms. Bruns noted that Claimant was distracted when not doing what he wanted, but she noted that he offered to bring toys from home to fill the treasure basket in the office. (Tr.at 400, 569.) She assessed that Claimant mostly was better at school and home, and continued his medications. (Id.) Claimant reported on November 4, 2010, that he liked his teacher

11

but that he got in trouble some at school and that his report card was not that good. (Tr. at 396, 565.) His father reported some difficulty reading. (Id.) With the exception of being distracted, Claimant's mental status exam was normal. (Tr. at 397, 566.) Ms. Bruns continued his medication and recommended an earlier bedtime. (Id.) On January 27, 2011, Dr. Hamm noted Claimant's complaints that he disliked the toys he received at Christmas. (Tr. at 506, 561.) It was noted that his grades in school were fine and that his medication helped. (Id.) With the exception of being distracted, mental status exam was unremarkable. (Tr. at 508, 563.) Dr. Hamm noted that Claimant mostly was better at home and at school and continued his medications. (Tr. at 509, 564.)

On February 7, 2011, Judith F. Lucas, M.A., a licensed psychologist, conducted a psychological evaluation of Claimant. (Tr. at 451-55.) Ms. Lucas noted that Claimant was six years old and in the first grade. (Tr. at 451.) Claimant's father reported that Claimant had bad behavior at home and at school, though it had improved since he started medication, and was overly active. (Id.) He reported Claimant's activities to have included going to school, sometimes watching cartoons, going out to eat or shopping on the weekend, swinging, riding his bike, keeping his room clean, and playing with kids at school. (Tr. at 452.) Claimant's mental status exam was normal with the exception of delayed judgment, which was consistent with his ability; severely deficient recent memory; and having been "very squirmy" and moving around a lot in his chair. (Tr. at 453.) On the Wechsler Intelligence Scale for Children – Fourth Edition ("WISC-IV"), Claimant received a full scale IQ score of 87. (Id.) Ms. Lucas noted that Claimant put forth a good effort, had some difficulty working independently and needed much encouragement, and seemed a little bit tired and less cooperative at the end of testing. (Id.) Although his scores were higher than those obtained in the school system, Ms. Lucas opined that they were a better estimate of his potential. (Id.) On WRAT-4 testing, Ms. Lucas noted that Claimant was antsy and gave up easily when Math

questions were asked but continued with encouragement. (Tr. at 454.) She diagnosed ADHD, combined and learning disorder NOS. (Id.) She opined that Claimant's prognosis was guarded and that he was in the low average cognitive range. (Id.) She noted no communication difficulties, delayed motor development that was consistent with ability, some concentration difficulties, good persistence with mild delays toward the end of testing, and normal pace. (Tr. at 454-55.)

On February 14, 2011, Dr. Rosemary L. Smith, Psy.D., a State agency reviewing medical consultant, completed a form Childhood Disability Evaluation Form, on which she opined that Claimant's ADHD was severe, but did not meet or equal a medical listing impairment. (Tr. at 456-61.) Dr. Smith opined that Claimant had less than marked limitations in acquiring and using information, attending and completing tasks, and interacting and relating with others. (Tr. at 456.) She noted that Claimant functioned intellectually in the low average range with consistent academic scores; had no significant limitations in concentration, persistence, or pace on consultative evaluation; and was cooperative at the consultative evaluation. (Id.) Dr. Smith assessed no limitations in the domains of moving about and manipulating objects, caring for yourself, and health and physical well-being. (Tr. at 459.) On July 8, 2011, Dr. Jeff Boggess, Ph.D., a State agency reviewing medical consultant, reviewed all the evidence, including the evidence submitted after Dr. Smith's opinion, and affirmed the opinion, as written. (Tr. at 516-21.)

On March 25, 2011, Claimant's father reported to Ms. Bruns that Claimant was doing well, had good behavior in school, and that his medication helped. (Tr. at 503, 558.) Mental status exam was normal and it was noted that Claimant remained busy straightening books on a shelf at the request of Ms. Bruns. (Tr. at 504, 559.) Ms. Bruns assessed that Claimant had good focus at school, and reinforced progress, encouraged therapy, and continued his medications. (Tr.at 504-05, 559-60.)

13

On April 12, 2011, Claimant's father reported to Mr. Samsock that Claimant's behavior had improved since his last evaluation. (Tr. at 469-70.) He noted that Claimant tended to listen better, but continued to remain disruptive with the staff at school. (Tr. at 469.) He reported that Claimant's moods generally had been good but he tried to hang himself several months ago in imitation of a movie. (Id.) Mental status exam was unremarkable. (Tr. at 470.) Mr. Samsock continued Claimant's diagnoses and assessed a GAF of 58. (Id.) He recommended that Claimant continue to receive individual psychotherapy and supportive counseling. (Id.)

On May 4, 2011, a treating provider at Willow Ridge completed a form Routine Abstract Mental, on which it was reported that Claimant had decreased social skills and concentration, was improving and not viewed as disabled, and required therapy and medication. (Tr. at 510-13.) Claimant's concentration, task persistence, and pace were mildly deficient, and his memory and social functioning were normal. (Tr. at 512.) From May 6, 2011, through December 14, 2011, it was noted that Claimant's medications continued to work, that he continued to do well in school and received fairly good grades, and that he essentially had normal mental status examination findings. (Tr. at 536-557.) It was noted that Claimant was in trouble occasionally at home and disrupted class every now and then. (Tr. at 544, 547.) On December 14, 2011, Dr. Hamm reported mostly good behavior for Claimant. (Tr. at 539.) On January 19, 2012, Claimant reported good behavior with some trouble. (Tr. at 532.) His dad reported however, that he was told that Claimant was failing the second grade and that the Concerta had lost its effectiveness. (Tr. at 535.) Ms. Bruns assessed that Claimant's behavior was more disruptive and argumentative and increased Adderall to 20mg. (Id.) On January 30, 2012, Ms. Bruns started a trial of Vyvanse and noted that Clonidine may be needed in the future. (Tr. at 531.) On March 15, 2012, Claimant reported having done much better on the higher dose of Vyvanse, with better behavior at home and at school, and

was less argumentative. (Tr. at 524.) On mental status exam, Ms. Bruns noted that Claimant's focus had improved and that he was more inquisitive. (Tr. at 526.) She continued his medications and noted that he was less argumentative. (Tr. at 527.)

Ms. Lucas re-evaluated Claimant on November 27, 2012, to aid in planning his program through Willow Ridge. (Tr. at 236-39.) Ms. Lucas noted that Claimant was eight years old and in the third grade. (Tr. at 236.) Claimant obtained a full scale IQ score of 89, which was in the low average range. (Tr. at 237.) Although he was cooperative, focused, and put forth consistent effort on testing, Ms. Lucas opined that Claimant's recognition of the test material possibly may have inflated the test scores. (Tr. at 237-38.) She diagnosed ADHD by history, disruptive behavior disorder NOS, and reading and math disorders. (Tr. at 239.)

On April 22, 2013, Mr. McDaniel, sent a letter to Claimant's counsel, and noted diagnoses of ADHD, disruptive behavior disorder, and reading and math disorders. Tr. at 591.) He noted that school records reflected behaviors consistent with the diagnoses and that Claimant participated in special education classes. (Id.) He opined that Claimant had marked difficulty in acquiring and using information, attending and completing tasks, and interacting and relating well with others. (Tr. at 591-92.) Mr. McDaniel noted that his opinions were supported by the fact that Claimant had participated in multiple interventions for ADHD and behavioral disorder, was a learning disabled student in special education classes, and required behavioral intervention plans within the school setting. (Tr. at 592.)

Educational Records.

On October 28, 2009, Raye H. Guy, Ed.S., a licensed school psychologist for Monroe County Schools, conducted a psychological evaluation. (Tr. at 332-34, 428-30.) Claimant was five years old and in Kindergarten. (Tr. at 332, 428.) On the WPPSI-III, Claimant obtained a full scale

IQ score of 68, which placed him in the mildly mentally impaired range. (Id.) On December 8, 2009, a report of the Monroe County Schools, proposed that Claimant was eligible for special education services as a mildly mental student, as supported by evaluations. (Tr. at 310, 330, 347-63.) Also on December 8, 2009, a Behavior Intervention Plan was established for Claimant. (Tr. at 347-63, 364-67, 369-74.)

On December 2, 2010, the Monroe County Board of Education Office performed its annual review of Claimant's Individualized Education Program ("IEP") services. (Tr. at 253-54, 425-49.) It was determined that an extended school year was not necessary. (Tr. at 254.) Although Claimant had a grade of "D-" in reading, his teacher opined that the grade failed to reflect his potential. (Tr. at 257.) She noted that Claimant failed to put forth an effort to complete his reading assignments and often had to be redirected to stay in his chair. (Id.) It was recommended that Claimant be placed in a co-teach setting for reading and math in the second grade. (Id.) It was noted that Claimant made great progress concerning his behaviors in the classroom and on the bus. (Id.) It was noted that Claimant required support in interacting with his peers and playing cooperatively by sharing toys and taking turns. (Id.) Claimant was placed in an 83.78% general education environment and 16.22% special education environment. (Tr. at 261.)

On April 18, 2011, Claimant's first grade teacher, Terri Bennett, completed a teacher questionnaire, on which she opined that Claimant was "extremely hard to deal with at times – being argumentative, having to have things done his way." (Tr. at 162-69.) Ms. Bennett noted that Claimant required additional help at times, but that he was "capable of doing better than he does." (Tr. at 163.) She noted that Claimant usually interrupted, and therefore, did not pay attention. (Id.) Regarding acquiring and using information, Ms. Bennett opined that with the exception of an obvious problem in expressing ideas in written form and applying problem-solving skills in class

discussions, Claimant's functioning was only slight. (Id.) Respecting the ability to attend and complete tasks, Ms. Bennett opined that Claimant had a serious problem paying attention and changing from one activity to another without being disruptive, and had an obvious problem in focusing and carrying out multi-step instructions, and completing work accurately without careless mistakes. (Tr. at 164.) She noted that Claimant was very strong willed and expected his needs to be met immediately. (Id.) Regarding Claimant's ability to interact and relate with others, Ms. Bennett opined that Claimant had a very serious problem seeking attention appropriately, expressing anger appropriately, asking permission appropriately, following rules, and respecting or obeying adults in authority. (Tr. at 165.) He had a serious problem in taking turns in a conversation and interpreting the meaning of facial expressions, body language, hints, and sarcasm. (Id.) Ms. Bennett also assessed an obvious problem in making and keeping friends and introducing and maintaining relevant and appropriate topics of conversation. (Id.) She noted that Claimant had been removed from the classroom, placed in time out, and received loss of free time. (Id.) Ms. Bennett noted no problems in moving about and manipulating objects, but serious problems in handling frustration, being patient, using good judgment regarding safety, identifying and appropriately asserting emotional needs, responding appropriately to changes in his own mood, using appropriate coping skills to meet daily demands, and knowing when to ask for help. (Tr. at 166-67.) She noted that Claimant was very demanding, but understood what he was doing, and therefore, was capable of doing better. (Tr. at 167.)

On November 26, 2012, the Greenbrier County Schools conducted an annual review of Claimant's IEP. (Tr. at 300-01, 302-20.) Claimant was placed in a 54.55% general education environment and 45.45% special education environment. (Tr. at 316.) His accommodations included having tests read aloud verbatim; having directions rephrased by a trained examiner;

having directions, passages, and prompts read aloud for online writing exercises; taking more breaks from studying, having untimed tests; and having flexible scheduling with extra time within the same day. (Tr. at 318-19.)

Claimant had his next annual review, by the Monroe County Board of Education Office on March 7, 2013. (Tr. at 204-20.) It was noted that Claimant was eight years old and in the third grade. (Tr. at 204.) His dual diagnoses by Dr. Hamm on June 15, 2010, including ADHD and disruptive behavior disorder, carried forward. (Tr. at 209.) As of November 1, 2012, he had IQ scores on WIATT-III testing of 87 Verbal, 92 Perceptual Reading, 80 Working Memory, and 82 Full Scale. (Tr. at 208.) He was placed in a 75.68% general education environment and a 24.32% special education environment. (Tr. at 217.) It was determined that Claimant would not be placed in intensive math because he picked up the skills gone over in class and his Standard Scores revealed that math was a relative strength for him. (Tr. at 220.) It further was determined that a behavior plan would not be written unless or until the school observed behavior that warranted such plan. (Id.) It was noted that the documentation of Claimant's behaviors were not consistent with each other between the two counties, and therefore, the Board was unsure which behaviors required intervention. (Id.)

Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ acted as an expert in assessing Claimant's functioning. (Document No. 12 at 3-4.) Specifically, Claimant first asserts that respecting the domain of acquiring and using information, the ALJ improperly concluded that his IQ score of 68 was inaccurate, when the medical evidence failed to support his finding. (Id. at 3.)   Second, Claimant asserts that the ALJ improperly concluded that because Claimant was in special education classes, required assistance,

and promoted to the next grade level, he was not disabled. (<u>Id.</u>) Claimant contends that the ALJ was required to obtain medical expert testimony to reach such conclusion. (<u>Id.</u>) Claimant next asserts that the ALJ improperly made similar conclusory statements in the domains of attempting and completing tasks, interacting and relating with others, caring for oneself, and health and physical well-being. (<u>Id.</u> at 4.)

In response, the Commissioner asserts that the ALJ is charged with making findings regarding Claimant's functional equivalence, which does not require that the services of a medical expert be obtained. (Document No. 15 at 10.) Claimant asserts that when an ALJ finds that a child's impairment fails to equal a listing, "the requirement to receive expert opinion evidence is satisfied by the opinion of the State agency's physician or psychological consultant." (<u>Id.</u>) The ALJ considered the opinions of Drs. Smith and Boggess, the State agency review psychological consultants, and accorded their opinions some weight to the extent that they were supported by the record. (<u>Id.</u> at 10-11.) The ALJ however, assessed a greater level of dysfunction in the domain of relating to others than did these consultants. (<u>Id.</u> at 11.) The Commissioner asserts that the ALJ's assessment also was supported by Claimant's treating practitioner from Willow Ridge, to whom the ALJ accorded great weight to the opinion. (<u>Id.</u>) Accordingly, the Commissioner contends that the ALJ's assessment was supported by the two medical expert opinions and the opinion of Claimant's treating provider. (<u>Id.</u> at 12.)

Claimant also alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in failing to find that Claimant's condition functionally equaled the listings due to limitations in acquiring and using information and interacting and relating with others. (Document No. 12 at 4-5.) Respecting the domain of interacting and relating to others,

Claimant asserts that the ALJ failed to obtain testimony from a medical expert and to explain why his condition was marked and not extreme. (Id. at 4.) Claimant further asserts that he was unable to pass a grade level on his own, and therefore, the ALJ should have assessed marked or extreme limitations in the domain of acquiring and using information. (Id.) Accordingly, Claimant contends that his impairments caused marked to extreme limitations in acquiring and using information and an extreme limitation in interacting and relating with others. (Id.)

In response, the Commissioner asserts that due to Claimant's wide range of activities, the ALJ correctly concluded that his impairments, functionally, did not equal the listings. (Document No. 15 at 13.) Respecting the domain of acquiring and using information, the Commissioner asserts that in finding less than marked limitations, the ALJ properly determined that Claimant passed each grade, attended regular classes, received average or good grades, that his issue was one of sitting still and not an issue of ability, that the teacher noted that Claimant was capable of doing better, and that his failure to follow directions was due to lack of attention rather than a lack of capacity. (Id. at 14-15.) Despite Claimant's allegation that the ALJ improperly rejected his full scale IQ score of 68 on October 28, 2009, the Commissioner asserts that under the Regulations, Claimant's IQ scores remained current for only one year. (Id. at 15.) Thus, the Commissioner notes that the ALJ issued his decision May 13, 2013, and therefore, the 2009, IQ score was not current. (Id.)   The ALJ therefore, properly relied on the subsequent full scale IQ scores of 87, 89, and 82, which placed him in the low to average range of intelligence. (Id. at 15-16.) These scores also indicated that Claimant lacked a significant cognitive impairment. (Id. at 16.) The Commissioner therefore contends that the ALJ's findings were not conclusory and were supported by medical evidence. (Id.)

20

Regarding the domain of interacting and relating with others, the Commissioner asserts that the ALJ properly found that Claimant's impairments did not cause very serious limitations. (Document No. 15 at 17-20.) The Commissioner asserts that Claimant began receiving medication in April 2010, and that his condition improved and was more manageable with treatment. (Id. at 18.)  Both Mr. Samsock and Willow Ridge noted improvement in Claimant's condition. (Id. at 18-19.) Accordingly, the Commissioner contends that Claimant's argument is without merit and that substantial evidence supports the ALJ's decision. (Id. at 19-20.)

Analysis.

1.  ALJ did not act as an expert in analyzing Claimant's limitations in the functional domains.

Claimant first alleges that the ALJ improperly acted as a medical expert in assessing Claimant's functioning in each of the six domains. (Document No. 12 at 3-4.) In his decision, the ALJ found that Claimant had "marked" limitations in only one domain, and therefore, concluded that Claimant's impairments did not functionally equal any of the listed impairments. The ALJ found that Claimant's impairments resulted in no limitation in moving about and manipulating objects; less than marked limitation in acquiring and using information, attending and completing tasks, caring for himself, and health and physical well-being; and marked limitation in interacting and relating with others. (Tr. at 21-28.)

The Court agrees with the Commissioner and finds that the ALJ was not required to solicit testimony from a medical expert regarding the severity of Claimant's impairments. The evidence of record, consisting of treatment notes, medical records, state agency consultant opinions, and educational records, constituted sufficient information upon which the ALJ could rely in assessing the severity of Claimant's limitations. See Hill v. Astrue, __ F.Supp.2d __, 2007 WL 666824 *6

(W.D. Va. Mar. 1, 2007) (finding that the ALJ did not err by failing to solicit testimony from a medical expert regarding the severity of the claimant's impairments when there was ample evidence upon which the ALJ could rely in reaching his finding regarding the severity of Claimant's impairments.). Though the Regulations "demand that a designated physician render an expert opinion on the issue of equivalence which is to be given appropriate weight by the ALJ," the opinions of the state agency medical consultants, combined with the treatment notes of record and Claimant's self-reports, eliminate the need to obtain separate testimony from an expert. See 20 C.F.R. § 416.926a(a), (d); SSR 96-6p. The state agency medical consultants' opinions essentially were "expert" opinions, on which the ALJ properly relied. Accordingly, the Court finds that the state agency physician's opinions satisfied the ALJ's obligation to receive expert opinion evidence. Contrary to Claimant's allegations, the ALJ based his findings on the opinions of the state agency medical consultants, and therefore, did not inject his own layman expert opinion. In addition to the State agency medical consultants' opinions, the ALJ placed great weight on the opinion of Claimant's treating psychologists, Dr. Hamm and Ms. Bruns. Although Dr. Hamm noted that Claimant was hyperactive and fidgety, she opined that Claimant's conditions were improving and that he was only mildly deficient in concentration, persistence, or pace, and had normal memory and social functioning. (Tr. at 20, 510-13.) She opined that Claimant was not viewed as disabled. (Id.) The ALJ specifically acknowledged Dr. Hamm's observations that he had normal speech, a cheerful mood, normal insight and perceptions, and only mildly deficient judgment. (Tr. at 20, 511.) Claimant's claim on this issue is without merit and substantial evidence supports the ALJ's decision.

2.  <u>Claimant's impairments did not functionally equal the Listings</u>.

Claimant also alleges that the ALJ erred in failing to find that his condition functionally equaled the Listings, due to limitations in the domains of acquiring and using information and relating with others. (Document No. 12 at 4-5.) The undersigned will address these two domains below.

A.  *Acquiring and Using Information*.

In the domain of acquiring and using information, the Commissioner considers how well the child acquires or learns information, and how well the child uses the information he acquired. 20 C.F.R. § 416.926a(g) (2013). For school-age children, age 6 to attainment of age 12, the child "should be able to learn to read, write, and do math and discuss history and science." 20 C.F.R. § 416.926a(g)(2)(iii). The child will need to use these skills in academic situations to demonstrate what he has learned, in daily living situations at home and in the community, and should use increasingly complex vocabulary to share information and ideas. <u>Id</u>. Examples of limitations in this domain include: (1) an inability to demonstrate understanding of words about size, space, or time; (2) an inability to rhyme words or sounds; (3) difficulty recalling important things learned in school the previous day; (4) difficulty solving mathematical questions or computing answers; and (5) an ability to talk only in short, simple sentences and difficulty explaining what you mean. 20 C.F.R. § 416.926a(g)(3).

The ALJ found that Claimant had less than marked limitation in this domain in part because the prior diagnosis of mild mental retardation was based on an IQ score of 68, that the ALJ considered invalid. (Tr. at 22.) Pursuant to the Regulations, IQ test scores obtained before age seven are considered "current" for two years if the tested IQ score is less than 40, and for one year,

if the IQ score is 40 or above. See 20 C.F.R. pt. 404, subpt. P, app. 1, § 112.000(D)(10). Claimant's IQ score was 68, which was above 40, and therefore, his IQ score was considered "current" for only one year. The ALJ therefore, appropriately considered the IQ score as being invalid because it was no longer "current" within the meaning of the Regulations.

The ALJ also discounted Ms. Bennett's report in 2011, that Claimant had significant issues in expressing ideas and applying problem solving. (Tr. at 22.) Contrary to Ms. Bennett's findings, the ALJ noted that Claimant had passed each grade level with assistance, attended regular classes, and received average or good grades. (Id.) The ALJ emphasized Ms. Bennett's statements that Claimant's issue was not one of ability, but one of sitting still and paying attention long enough to meet established goals. (Id.) The undersigned finds that the issue therefore, is one that is at the very heart of his diagnosed impairments, ADD and ADHD. Claimant has difficulty maintaining attention, and as Ms. Bennett opined, he is unable to sit still and pay attention long enough to meet goals. Accordingly, in view of the nature of Claimant's impairment and the assessment of Ms. Bennett, the undersigned finds that remand is necessary for further consideration of limitations in this domain.

B. *Interacting and Relating With Others*.

In the domain of interacting and relating with others, the Commissioner considers how well the child initiates and sustains emotional connections with others, develops and using language in the community, cooperates with others, complies with rules, responds to criticism, and cares for the possessions of others. 20 C.F.R. § 416.926a(i) (2013). For school-age children, age 6 to attainment of age 12, the child "should begin to prefer playmates [his] own age and start to develop friendships with children who are [his] age." 20 C.F.R. § 416.926a(i)(2)(iii) (2013). The child

should be able to use words instead of action to express himself. Id. Examples of limited functioning in this domain include: (1) an inability to reach out to be picked up by the caregiver, (2) a lack of close friends or friends that are of a different age group, (3) avoidance or withdrawal from known people or anxiety and fear in meeting new people, (4) difficulty playing games or sports with rules, (5) difficulty communicating with others, and (6) difficulty speaking intelligibly or with adequate fluency. 20 C.F.R. § 416.926a(i)(3) (2013).

The ALJ found that Claimant had marked limitations in this domain. (Tr. at 24-25.) The ALJ noted that Claimant was unable to listen to others and was disruptive, aggravated other children and adults, and made it difficult for others to be around him. (Tr. at 25.) Furthermore, the ALJ noted that Ms. Bennett indicated that he was hardheaded and that his limitations in this domain were very severely limiting. (Id.) The ALJ did not assess more than marked limitations in this domain because Claimant had friends at school and interacted appropriately with counselors and psychologists. (Id.) Ms. Bennett's report however, indicated that Claimant had a very serious problem seeking attention appropriately, expressing anger appropriately, asking permission appropriately, following rules, and respecting or obeying adults in authority. (Tr. at 165.) Furthermore, she assessed an obvious problem in Claimant making and keeping friends, taking turns in conversations, and maintaining appropriate topics of conversation. (Id.) Ms. Bennett had to discipline Claimant on many occasions, which included removing him from the classroom. (Id.) Thus, despite Claimant having friends, Ms. Bennett was of the opinion that he had severe difficulties in maintaining friendships. Furthermore, despite having interacted appropriately with counselors and psychologists, Ms. Bennett opined that Claimant had severe difficulties in respecting and obeying adults, which also was reflected in Claimant's repeated failure to obey his

father. Ms. Bennett observed Claimant's behavior on a daily basis. In view of her severe assessments, the undersigned finds that the ALJ's assessment of only marked limitations in this domain is not supported by substantial evidence. The ALJ failed to acknowledge the severity of the limitations as assessed by Ms. Bennett. For this reason, the undersigned finds that the matter must be remanded.

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **GRANT** the Plaintiff's Motion for Remand (Document No. 12.), **DENY** the Defendant's Motion for Judgment on the Pleadings (Document No. 15.), **REVERSE** the final decision of the Commissioner, **REMAND** this matter pursuant to sentence four of 42 U.S.C. 405(g) for further administrative proceedings for further consideration of Claimant's impairments at step three of the sequential analysis, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, Senior United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of <u>de novo</u>

review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. <u>Snyder v. Ridenour</u>, 889 F.2d 1363, 1366 (4th Cir. 1989); <u>Thomas v. Arn</u>, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985), <u>reh'g denied</u>, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); <u>Wright v. Collins</u>, 766 F.2d 841, 846 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91, 94 (4th Cir.), <u>cert. denied</u>, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984). Copies of such objections shall be served on opposing parties, Senior District Judge Faber, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to send a copy of the same to counsel of record.

Date: February 8, 2016.

Omar J. Aboulhosn
United States Magistrate Judge